Ted W. Cassman (Cal. Bar 98932)
Laurel Headley (Cal. Bar 152306)
ARGUEDAS, CASSMAN, HEADLEY &
GOLDMAN LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone:     (510) 845-3000
Facsimile:     (510) 845-3003
*Counsel for Defendant*
*LIANG CHEN*

Leland B. Altschuler (CA SBN 81459)
LAW OFFICES OF LELAND B.
ALTSCHULER
1580 Cañada Lane
Woodside, CA 94062
Telephone: (650) 328-7917
Facsimile: (650) 989-4200
*Counsel for Defendant*
*DONALD OLGADO*

Daniel Olmos (CA SBN 235319)
Evan C. Greenberg (CA SBN 271356)
NOLAN BARTON & OLMOS, LLP
600 University Avenue
Palo Alto, CA  94301
Telephone: (650) 326-2980
Facsimile: 650-326-9704
*Counsel for Defendant*
*WEI-YUNG HSU*

Bruce C. Funk (CA SBN 122340)
LAW OFFICE OF BRUCE C. FUNK
46 W. Santa Clara Street
San Jose, CA 95113
Telephone: (408) 280-6488
Facsimile: (408) 286-3139
*Counsel for Defendant*
*ROBERT EWALD*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>　　　Plaintiff,<br><br>vs.<br><br>LIANG CHEN,<br>DONALD OLGADO,<br>WEI-YUNG HSU, and<br>ROBERT EWALD<br><br>　　　Defendants. | Case No. CR 17-00603 BLF<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE SEIZED DURING EXECUTION OF SEARCH WARRANTS FOR (1) LACK OF PROBABLE CAUSE, (2) LACK OF PARTICULARITY, (3) OVERBREADTH AND (4) *FRANKS* VIOLATIONS; REQUEST FOR EVIDENTIARY HEARING<br><br>Date:　October 23, 2020<br>Time:　9:00 a.m.<br>Dept.:　Courtroom No. 3 |

**Table of Contents**

I.      INTRODUCTION ...................................................................................................1

II.     FACTS .....................................................................................................................3

        A.      The Indictment ............................................................................................3

        B.      The Preceding Civil Lawsuit ......................................................................3

        C.      The Challenged Search Warrants and Supporting Affidavit ........................4

                1.      Issuance of the Warrants ..................................................................4

                2.      The Affidavit for the Search Warrants .............................................6

                3.      Material Information Omitted or Misrepresented in the Affidavit ............9

                4.      Execution of the Warrants ..............................................................12

                        a. The Warrant for Mr. Olgado's Residence ............................12

                        b. The Warrant for the Three Gmail Accounts .........................13

III.    ARGUMENT .........................................................................................................14

        A.      The Search Warrants Issued without Probable Cause ...........................14

        B.      Material Omissions of Fact Vitiated the Probable Cause Showing in the
                Search Warrant Affidavit ...........................................................................18

        C.      The Search Warrants Lacked Sufficient Particularity and were Overbroad .........22

        D.      The Execution of the Search Warrants Exhibited a Reckless Pattern of
                Disregard for the Applicable Rules and Protocols.................................24

IV.     CONCLUSION ......................................................................................................25

## **Table of Authorities**

**Cases**

*Brinegar v. United States*, 338 U.S. 160 (1949).................................................................16

*Coolidge v. New Hampshire,* 403 U.S. 443 (1971) ...........................................................24

*Franks v. Delaware,* 438 U.S. 154 (1978) ........................................................ 3, 20, 22, 24

*Grand Jury Subpoena v. Kitzhaber*, 828 F.3d 1083 (9th Cir. 2016)..................................15

*Illinois v. Gates*, 462 U.S. 213 (1983)...............................................................................16

*In re Google Email Accounts Identified in Attachment A,* 92 F. Supp. 944 (D. Ak. 2015) ..........26

*In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847 (9th Cir. 1991)......................25

*Stanford v. Texas,* 379 U.S. 476 (1965) .............................................................................25

*United States v. Blake*, 868 F.3d 960 (11th Cir. 2017) ......................................................26

*United States v. Chung*, 659 F.3d 815 (9th Cir. 2011)..........................................................2

*United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013)................................................15

*United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008) .................................................15

*United States v. Hanna,* 661 F.3d 271 (6th Cir. 2011).......................................................26

*United States v. Johns*, 948 F.2d 599 (9th Cir. 1991)...................................................21, 23

*United States v. Lefkowitz*, 618 F.2d 1313 (9th Cir. 1980) ...............................................20

*United States v. Liew*, 856 F.3d 585 (9th Cir. 2016) ............................................. 17, 18, 19

*United States v. Minh Hoang*, No. 2:17-cr-0444-TC, 2019 U.S. Dist. LEXIS 191834 (D.
    Utah Nov. 4, 2019) .................................................................................................19

*United States v. Mutschelknaus,* 592 F.3d 826 (8th Cir. 2010)........................................28

*United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (*en banc*) .................................2, 8, 17

*United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009) ...................................25

*United States v. Sember*, 170 F. Supp. 3d 1049 (W.D. Oh. 2016)........................................19

*United States v. Spencer*, 439 F.3d 905 (8th Cir. 2006)....................................................28

*United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986))...................................................26

*United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985)................................................21, 22, 23

*United States v. Underwood*, 725 F.3d 1076 (9th Cir. 2013)........................................16, 18

*United States v. United States District,* 407 U.S. 297 (1972) .............................................14

*United States v. Wong*, 334 U.S. 831 (9th Cir. 2003) ........................................................25

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ...............................................................16

**Statutes**

18 U.S.C. § 2...................................................................................................................3

18 U.S.C. § 1030...................................................................................................*passim*

18 U.S.C. § 1832...................................................................................................*passim*

18 U.S.C. § 1839(3)..........................................................................................2, 17

California Civil Code § 2019.210...........................................................................4

**Constitutional Provisions**

Fourth Amendment.................................................................................................*passim*

1

2

## I.    INTRODUCTION

3

        Defendants Liang Chen, Donald Olgado, Wei-Yung Hsu, and Robert Ewald are charged,

4

*inter alia*, with conspiring to steal trade secrets from their former employer, Applied Materials,

5

Inc. ("AMAT") during the Fall of 2012.  These criminal charges were preceded by a state court

6

civil lawsuit in which AMAT pressed similar allegations of trade secret theft against the same

7

defendants and applied for a temporary restraining order ("TRO") against them.  On December

8

21, 2012, after receiving evidence from both sides, a Superior Court judge denied AMAT's

9

application for the TRO, finding that AMAT had *"failed to show a reasonable probability that it*

10

*is likely to prevail on the merits"* and that "*the defense ..., did a good job of showing parts of*

11

*what was claimed to be trade secrets is in the public domain."*  Exhibit L, TR 163:15; TR 167:5,

12

excerpt of transcript of proceedings.  Less than three months later, the FBI obtained search

13

warrants for Mr. Olgado's residence and for Mr. Olgado's, Mr. Chen's and Mr. Ewald's personal

14

Gmail accounts; the warrants authorized searches for evidence of computer fraud and trade

15

secrets theft in violation of 18 U.S.C. §§ 1030(a)(4) and 1832, respectively.  Remarkably,

16

although the affidavit supporting the search warrants acknowledged the existence of AMAT's

17

civil law suit, it failed to disclose to the magistrate that the state court judge had refused to grant

18

AMAT's request for a TRO based on a finding that AMAT did not have a reasonable likelihood

19

prevailing on its trade secrets claims.

20

        This conspicuous omission of material fact is but one of several glaring deficiencies in

21

the application for the warrants.  First, the affidavit presented no evidence to support the

22

assertion that any of the Defendants accessed AMAT's computer system without authorization in

23

violation of 18 U.S.C. § 1030(a)(4).  *See United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (*en*

24

*banc*).  In other words, one of the two purported bases for issuance of the warrants was entirely

25

26

27

28

specious.  Second, the affidavit's assertions of probable cause relating to trade secrets theft was based on singularly slender reeds:  aside from two entirely conclusory opinions from AMAT and from the affiant, the affidavit included only one brief factual statement (two sentences) expressing AMAT's subjective belief that Defendants' asserted conduct involved trade secrets. The affidavit was bereft of any evidence demonstrating that the allegedly stolen material was in fact secret, that AMAT took reasonable measures to protect the confidentiality of that material, or that the material possessed independent economic value arising from being secret.  In other words, the affidavit failed to establish probable cause regarding any of the three definitional requirements for a trade secret.  *See* 18 U.S.C. § 1839(3); *United States v. Chung*, 659 F.3d 815, 824-25 (9th Cir. 2011).  For these and other reasons elaborated below, the warrants issued without probable cause.

In addition, the warrants were overbroad and lacked sufficient particularity.  The warrants authorized the seizure of a virtually unlimited and breathtakingly broad scope of documents, emails, attachments, devices, and files completely unrelated to any arguable probable cause established by the affidavit.  The property descriptions were untethered to the affidavit's allegations of criminal activity—Trade Secret Theft and Computer Fraud—and failed to provide sufficient guidance to the executing agents as to what items might be seized.

Finally, as stated above, the affidavit's feeble assertion of probable cause was thoroughly vitiated by material misrepresentations and omissions of fact.  The most conspicuous omission was the affidavit's failure to inform the reviewing magistrate that AMAT had failed to convince a judge that it was likely to prevail on the merits on *civil* claims that the Defendants had allegedly stolen AMAT's trade secrets.  Given the paucity of substantiation for the assertion that AMAT's trade secrets were stolen, this omission alone would have caused a reasonable

magistrate to refrain from issuing the warrants.  Moreover, that omission was just one of many distortions of fact that undermined the integrity of the warrant and detracted from probable cause.  For these reasons, the Court should grant an evidentiary hearing and, ultimately, order suppression of the evidence seized pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978).

## II.        FACTS

### A.        The Indictment

On November 30, 2017, Defendants were indicted, *inter alia*, for conspiring to steal AMAT's trade secrets in violation of 18 U.S.C. § 1832(a)(5) between approximately September and December 2012.  ECF No. 1.  Count One alleges that Defendants were high-level AMAT employees who decided to steal AMAT's Metal Organic Chemical Vapor Deposition ("MOCVD") technology for the manufacture of wafers for use in flat screens, monitors and other devices using light emitting diodes (i.e. "LEDs") and to use AMAT's MOCVD technology at a new competing company that Defendants intended to create.  *Id.* 1, ¶¶ 6–10, 13–16.  Each of Counts Two through Eleven charges each Defendant with a substantive count of receiving and possessing stolen trade secrets in violation of 18 U.S.C. § 1832(a)(3) and 2.  Each substantive count specifically identifies an alleged trade secret stolen by Defendants as either a machine part or a Computer Aided Design drawing ("CAD drawing") for a machine part.  *Id.* ¶¶ 10, 20.

### B.        The Preceding Civil Lawsuit

Almost five years before the indictment was filed, on December 13, 2012, AMAT initiated civil litigation in state court against these same Defendants based on claims that they stole AMAT's trade secrets relating to the same MOCVD technology as alleged in the subsequent indictment.  *Applied Materials, Inc. v. Liang Chen, et al.*, Santa Clara County Superior Court Case No. 1-12-CV-237790; Exhibit I.  AMAT also sought a TRO.  Declaration

of Leland B. Altschuler ("Altschuler Decl."), ¶ 2.

AMAT's application for the TRO was heard by the Hon. William J. Monahan on December 21, 2012.  After considering numerous exhibits and sworn declarations from both sides, including declarations from Messrs. Chen and Hsu, the judge rejected a TRO:

> So the request for the temporary restraining order, it's denied.  *Plaintiff has failed to show a reasonable probability that it is likely to prevail on the merits.*  So I'm denying that request. And so I am just putting an "X" through it and writing "TRO is denied." Okay? . . . . [¶] . . . . [A]gain, the defense — and I don't want to go into it. I'm not trying to make a statement of decision.  But *the defense, with respect to information they were given in the initial papers, did a good job of showing parts of what was claimed to be trade secrets is in the public domain.*  And so rather than – anyway, enough said.  So – but I have considered the evidence.

Exhibit L, excerpt of transcript, TR 163:15; TR 167:5, emphasis added.  Exhibit M is a copy of Judge Monahan's written order denying the TRO.

After the TRO was denied, AMAT did not seek rehearing or pursue a preliminary injunction.  Nor did AMAT provide Defendants with a particularized disclosure of the trade secrets that Defendants allegedly stole in order to conduct related discovery, as required by California Civil Code § 2019.210.  Instead, AMAT turned to the federal authorities seeking Defendants' prosecution.  Altschuler Decl., ¶¶ 3-4.

During the course of the litigation over the TRO, AMAT asked Mr. Olgado, who at the time was *still an AMAT employee*, to return to AMAT any company property that he kept at his home office.  Mr. Olgado agreed and delivered about 11 cartons of materials.  Mr. Olgado stipulated that his voluntary delivery could be reduced to an order of court.  Altschuler Decl., ¶ 5.

### C.     The Challenged Search Warrants and Supporting Affidavit

#### 1.     Issuance of the Warrants

On January 18, 2013, federal agents and two Assistant U.S. Attorneys met with representatives of AMAT and were informed that Messrs. Chen, Olgado, Hsu, and Ewald "stole

[AMAT's] intellectual property, were caught, and have since denied these actions."  Altschuler Decl., ¶ 6.  Six weeks later, F.B.I. Special Agent Ann B. Trombetta applied for and obtained from Magistrate Judge Paul S. Grewal search warrants for Mr. Olgado's residence and for the personal Gmail accounts of Mr. Olgado, Mr. Chen, and Mr. Ewald seeking evidence related to two substantive criminal violations, 18 U.S.C. § 1832 (Trade Secrets Act) and 18 U.S.C. § 1030 (Computer Fraud and Abuse Act).  Exhibits A, B, and C.

The warrants authorized extensive searches through Defendants' email accounts and Mr. Olgado's residence—-including his computer, devices and personal documents—for any item dated within the preceding twelve months that *referred to or pertained in any way to* AMAT or to Defendants' former supervisors, several other employees at AMAT and numerous other items.  Exhibits B and C, Attachment A-2.  More specifically, the attachment describing the items to be seized for the warrant for the three Gmail accounts made no reference to any criminal statutes or alleged offenses and permitted the agents to copy and seize all of the following:

A.  Any e-mail or attachment containing content from the accounts listed in Section II for the time period from March 1, 2012 to the present may be copied by law enforcement personnel if the email or attachment refers or pertains in any way to:

i.   Applied Materials, Applied, AMAT or amat, but only if those terms appear in a context that connects them to the conduct described in the search warrant affidavit;

ii.  Mark Pinto and/or Michael Splinter;

iii. Nlighten; Paragon; Envision; Neon;

iv.  "third party;" "joint venture;" spinout; spinoff; "license agreement, "licensing agreement," "demo licenses," or any reference to a "license;" "patent;" investment(s) or investor(s); presentation(s); Jeff Hagan or Canaccord Genuity; Network Attached Storage (NAS); SolidEdge (SE);

v.   Any of the following venture or venture capital (VC) or private equity firms: GSR, Northern Light, IDG, IPV, Rockport Capital, and the Westly Group; Shanghai or China; Alain Harrus; Crosslink Capital;

vi. "separation package" (or just "package");

vii. Google shared drive; SOE; Computer Aided Design (CAD); business model; saratech or saratechinc; thumb drive or USB; "RAID;" File transfer protocol ("FTP"); Bills of Materials (BOM); Metal Organic Chemical Vapor Deposition (MOCVD); Gallium Nitride (GaN); Light Emitting Diodes (LED); "CDS" or "showerhead;" "top level assembly" (or just "assembly);" "part numbers;"

viii. conflict of interest (or just "conflict"); "paper trail;" any references to avoiding the use of email to communicate;

ix. "fatboy;" "Newco;"

x. Any communications between or among Donald Olgado,      Liang Chen, Wei-Yung Hsu, Robert Ewald, Eashwer Kollata, Raman Talwar, or Siqing Lu;

B. All of the records and information described above in Section II(b).

Exhibit B, Attachment A-2.

Similarly, although the introductory passage of the attachment to the warrant for Mr. Olgado's residence describing the items to be seized referred to records "relating to possible violations of 18 U.S.C. §§ 1030 and/or 1832 and that involve Applied Materials or Envision," the attachment then utilized virtually the same expansive language set forth above.  Exhibit C, Attachment B.  Accompanying the warrants were two protocols establishing the procedures that Google and the investigating agents were to employ during execution of the warrants.  Exhibit A, ¶¶ 37 & 45-50, Attachments A-2 & C.

## 2.    The Affidavit for the Search Warrants

The search warrant affidavit commenced with background information concerning the affiant, the investigation, the alleged offenses as to which the affiant asserted probable cause (i.e., "violations of 18 U.S.C. §§ 1832 (trade secret theft) and 1030 (computer fraud)"), and the locations to be searched.  Exhibit A, ¶¶ 1-3.  The affiant's experience included membership in the California State Bar and prior employment as a Deputy District Attorney and Public

Defender.  *Id*. at ¶ 3.  After setting forth the relevant texts of §§ 1832 and 1030, the affidavit presented the "Facts Supporting Probable Cause," which we now summarize.

The affiant stated that AMAT believed that the Defendants had "engaged in the theft of [AMAT's] trade secrets and computer fraud."  Exhibit A, ¶ 7.  After describing the Defendants' former positions at AMAT and their involvement with two AMAT projects ("Neon" and "Paragon") and MOCVD technology, the affidavit acknowledged that in March 2012 AMAT "shut down" Project Neon for "economic reasons" and alleged that as of July 20, 2012, AMAT had decided not to pursue any proposals for joint ventures or "spinout" companies using the MOCVD technology.  Exhibit A, ¶¶ 8-11.  The affidavit asserted that AMAT's Executive Vice President informed Mr. Chen of that decision, told him "that he had no authorization going forward to represent any connection to Applied Materials for any future venture" and later told him "to separate himself internally and externally from all activities involving Applied Materials' MOCVD technology…."  *Id*. at ¶ 11.

Noting that each of the Defendants had signed AMAT's Employee Agreements before starting work there, the affidavit quoted from one passage:

> all inventions, copyrightable works and confidential information … produced, conceived, made or first actually reduced to practice by me solely or jointly with others during the period of my employment with APPLIED … are hereby assigned to APPLIED and shall be the exclusive property of APPLIED.

Exhibit A, ¶ 12.  Conspicuously absent from the affidavit was any assertion that AMAT's Employee Agreements imposed any requirements concerning the *treatment* of AMAT confidential materials or trade secrets.

The affidavit next presented evidence, primarily derived from emails between the Defendants, supporting the allegations that Defendants had used their personal email accounts and that Defendant Olgado had worked from home as part of an effort to use Nlighten and

Paragon technology to "form a new company, Envision, that would be built upon that technology." Exhibit A, ¶¶ 13, 14-32. Many of these emails had been provided to AMAT by Mr. Olgado "pursuant to a Stipulated Temporary Restraining Order (TRO) between Olgado and Applied Materials." *Id.* ¶14. The affidavit quoted from a cover letter that Mr. Olgado's attorney had sent to AMAT's attorney when the items were produced pursuant to the Stipulated TRO. *Id.*

Notably, the affidavit included no facts suggesting that any of the Defendants had accessed AMAT's computers or downloaded material from AMAT's computers at a time when they were not employed at AMAT and/or were unauthorized to do so within the holding of *Nosal*, 676 F.3d 854. With regard to the alleged theft of trade secrets, the affidavit noted that Defendant Olgado sent an email discussing "Nlighten's Bills of Materials (BOMs)," explained that BOMs "identify the part numbers and quantity of each part used" in a project, and then asserted that:

> Applied Materials considers its BOMs trade secrets as they provide a roadmap to the design and construction of the equipment and tools, as well as insight into the manufacturing innovations employed by Applied Materials, and where they are placed in a project. As such, Applied Materials would not distribute BOMs to potential customers.

Exhibit A, ¶ 29. This statement regarding BOMs is the only assertion in the affidavit's section titled "Facts Supporting Probable Cause" that purports to identify any of the material that Defendants allegedly misappropriated as a "trade secret."

In addition to the two sentences about the BOMs, the affidavit referred to one other document—described as a PowerPoint presentation—that Mr. Hsu attached to an email that he sent to the other Defendants. The affidavit described the attachment as "WY-Competitive Analysis 092412" and alleged that it contained two pages marked "Applied Materials Confidential." Exhibit A, ¶ 20. It is clear from the affidavit that at the time Mr. Hsu sent the

PowerPoint on September 22, 2012, each of the Defendants was still an AMAT employee and authorized to possess it. *Id.* Despite the reference to two pages marked "confidential," the affidavit does not suggest that Mr. Hsu misappropriated the PowerPoint or that anything in the PowerPoint constituted a trade secret.

The above is the sum total of information provided to the magistrate regarding whether the Defendants' conduct implicated AMAT's alleged trade secrets. Aside from the reference to BOMs, the affidavit included no facts at all demonstrating that (1) the material described in affidavit as having been stolen was in fact secret, (2) AMAT had taken any reasonable measures to protect the confidentiality of any of its allegedly misappropriated property, or (3) the allegedly misappropriated property possessed independent economic value arising from being secret. Nevertheless, the affidavit baldly offered the affiant's conclusory "belief" that evidence of the offenses of theft of trade secrets and computer fraud would be found on devices that Mr. Olgado possessed at his residence and on emails in three identified Gmail accounts. Exhibit A, ¶¶ 33-34.

### 3.  Material Information Omitted or Misrepresented in the Affidavit

The affidavit misrepresented and/or omitted numerous material facts, which detracted from any purported probable cause for issuance of the search warrants. Chief among these omissions, as previously noted, was the affidavit's failure to notify the magistrate that a state court judge, after an evidentiary hearing, had rejected AMAT's application for a TRO. Exhibit L, excerpt of transcript, TR 163:15; TR 167:5, emphasis added. The omission is inexplicable: The affidavit expressly acknowledged the litigation and included references to the Stipulated TRO between Olgado and AMAT, pursuant to which Mr. Olgado had provided AMAT with many of the emails that the affidavit cited. Exhibit A, at ¶ 14. As a trained FBI agent, attorney and member of the State Bar (*Id.* at ¶ 3), the affiant could not have missed the significance of a

court finding that AMAT was not likely to prevail on the merits relating to the very same trade secrets that she was investigating.  Yet the affiant chose to disclose the existence of a Mr. Olgado's Stipulated TRO while concealing the fact that a contested TRO application *against Defendants* had been rejected by the court.  With that maneuver, the affiant implied that Mr. Olgado was admitting or at least not denying AMAT's allegations of trade secret theft while simultaneously depriving the magistrate of information demonstrating that Defendants had so far successfully resisted those allegations to the point that a court denied AMAT's contested application for a TRO.  This constituted a deliberate or reckless omission of material fact.

The affidavit's integrity was further tarnished by numerous other significant omissions. These included the following:

- The affidavit failed to disclose that the four Defendants had denied AMAT's theft allegations and that at the time of the search warrant application the four Defendants were continuing to oppose AMAT's trade secret theft claims in pending civil litigation.  By informing the magistrate that Mr. Olgado had entered into the Stipulated TRO without explanation and without reference to the contested TRO application on which Defendants prevailed, the affidavit created the false impression that the Defendants had not denied the allegations of theft and that at least one of them (Mr. Olgado) had admitted the allegations.  *Compare* Altschuler Decl., ¶¶ 2-5.

- The affidavit failed to disclose that Mr. Chen and Mr. Hsu had filed sworn declarations in the civil litigation denying AMAT's claims and providing detailed answers to AMAT's allegations of trade secret theft.  Chen Declaration, Exhibit J; Hsu Declaration, Exhibit K. These declarations were among the evidence that the state judge credited in determining that AMAT was unlikely to prevail on its trade secret theft claims.

- The affidavit failed to disclose that Mr. Chen's declaration expressly addressed the PowerPoint presentation described in the search warrant affidavit—the attachment to Mr. Hsu's email, "WY-Competitive Analysis 092412"—as an example of "confidential" AMAT information that the Defendants distributed among themselves.  Exhibit A, ¶ 20.  In his Declaration, Mr. Chen explained that attachment "WY-Competitive Analysis 092412" "was a PowerPoint presentation that I gave to the president of [AMAT] Gary Dickerson … and it is from general marketing material that is publicly available."  Exhibit J, Chen Declaration, ¶ 15.  Mr. Chen further explained that a publicly available PowerPoint presentation that AMAT provided to the Department of Energy contained "the same photographs of Applied Materials process, diagrams and information" as appeared in attachment "WY-Competitive Analysis 092412".  Exhibit J, Chen Declaration, ¶¶ 15-16.   *See* Exhibit N, the presentation to the DOE that was Exhibit Six to the Chen Declaration.

- The affidavit failed to disclose that attached as an exhibit to Mr. Chen's Declaration was an August 24, 2012, email from Gary Dickerson, AMAT's President, to Mr. Chen stating that although he did not think AMAT desired to be proactive "on a potential spinout," he "personally would be happy to help you with this project if you can find some group that can make a more compelling proposal."  (A copy of this email was attached to Mr. Chen's Declaration as Exhibit 9.)  *See* Exhibit O.  This email contradicts the affidavit's assertion that as of July 20, 2012, Mr. Chen "had no authorization going forward to represent any connection to Applied Materials for any future venture…."  *See* Exhibit A, ¶ 11.  The email also demonstrates that, contrary to the affidavit's assertions, Mr. Chen did not conceal from AMAT his continued efforts to find a partner for putting AMAT's

MOCVD technology to use.

- The affidavit failed to disclose that attached as an exhibit to Mr. Chen's Declaration was an email exchange from December 11, 2012—two days before AMAT filed its lawsuit against Defendants—in which AMAT's then Executive Vice President expressed interest ("I do need to understand a few things before committing") in Mr. Chen's invitation to join the Board of Directors of Mr. Chen's "new venture" (i.e. Envision), the company that Defendants were forming and that would allegedly "be built upon" AMAT's misappropriated technology. (A copy of the email exchange was Exhibit 11 to Mr. Chen's Declaration.) *See* Exhibit P, December 17, 2012 email. Mr. Chen's invitation for AMAT's then Executive Vice President to serve on the Board of his new company is inconsistent with an intent to build that company on stolen trade secrets from AMAT.

### 4. Execution of the Warrants

#### a. The Warrant for Mr. Olgado's Residence

The search warrant for Mr. Olgado's residence was executed on March 12, 2020. The search protocol required that during execution of the warrant, the search team determine "whether all or part of a search of a device or media that stores data electronically ('the device') reasonably can be completed at the location listed in the warrant ('the site') within a reasonable time." Exhibit C, Attachment C, ¶ 1. The protocol further provided that if electronic devices could not reasonably be searched onsite, then the devices would either be imaged onsite or seized and imaged off-site. *Id.*, ¶¶ 2-3. If the agents seized the devices for imaging off-site, the protocol provided that the devices must be imaged within 60 days and must be returned or destroyed within 60 days after the imaging was complete. *Id.*, ¶¶ 2-3.

The agents violated the protocol in two ways. First, before the search of Mr. Olgado's

residence, the affiant emailed the forensics team stating that "I do not expect any onsite imaging. If a computer contains evidence, we will seize."  Exhibit D, March 8, 2013 email.  Consistent with that directive, the agents seized two devices and a hard drive from Mr. Olgado's residence. Exhibit E, Search Warrant Return for the Olgado residence.  Second, the government failed to return the seized devices to Mr. Olgado within 60 days after they were imaged—and, in fact, failed even to seek an extension of the time period for return of the devices until three months after the applicable time period had expired.  Exhibit F, Ex Parte Application For Extension of Time; Altschuler Decl., ¶ 7.  Although the application was granted, there was no good cause for the government's failure to timely seek extension of the 60-day time period.  The government apparently received three reports of forensic examinations of the electronic devices seized from Mr. Olgado's residence dated March 22, 2012, December 2. 2012 and June 4, 2014.  Exhibit G.

### b.     The Warrant for the Three Gmail Accounts

The warrant for the Gmail accounts was executed on March 11, 2013.  On April 8, 2013, the case agent filed the return, in which she confirmed her receipt from Google of one compact disc containing documents for the three Gmail accounts.  Exhibit H, Search Warrant Return for the Gmail Accounts.  As noted above, the search warrant required compliance with protocols for the agents' search of the documents provided by Google under the warrant.  Exhibit B, Attachment A-2.  In part, the protocol provided that after receipt of responsive documents, the agents would "thereafter review the information stored in the accounts and files received from Google employees and then identify and copy only the information contained in those accounts and files which is authorized to be further copied as described in Section III below."  Exhibit B, ¶¶ 45-50, Attachment A-2, ¶ I.d.  Despite defense counsel's extensive examination of the discovery and specific requests for clarification from the government, counsel have not been

provided with any report or other document describing the agents' search of the compact disc

provided by Google and/or their compliance with the protocols established by the warrant.

Altschuler Decl., ¶ 8.

### III.   ARGUMENT

The Supreme Court long ago recognized that the "physical entry of the home is the chief

evil against which the wording of the Fourth Amendment is directed." *United States v. United*

*States District,* 407 U.S. 297, 313 (1972).  Observing that electronic storage devices such as

computers, laptops, and mobile phones similarly "contain the most intimate details of our lives:

financial records, confidential business documents, medical records and private emails," the

Ninth Circuit has held that records on such devices "are expected to be kept private and this

expectation is one that society is prepared to recognize as reasonable." *United States v.*

*Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) (citation omitted).  Finally, the Ninth Circuit's

decision in *United States v. Forrester*, 512 F.3d 500, 511 (9th Cir. 2008), established that the

content of emails is entitled to same protection from governmental intrusion as physical mail.

*See also Grand Jury Subpoena v. Kitzhaber*, 828 F.3d 1083, 1090 (9th Cir. 2016) ("Kitzhaber

thus has a strong claim to a legitimate expectation of privacy in his personal email, given the

private information it likely contains.").  Under these authorities, Mr. Olgado's residence, the

electronic storage devices found within it, and the content of the emails in Mr. Chen's, Mr.

Olgado's, and Mr. Ewald's Gmail accounts were all entitled to the most rigorous protections

afforded by the Fourth Amendment.  As we demonstrate below, the challenged warrants in this

case utterly failed to measure up.

### A.   The Search Warrants Issued without Probable Cause

Determining whether there is probable cause for a search involves a two-step inquiry:

(1) whether "the facts and circumstances … [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed," and (2) whether "there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949); *Zurcher v. Stanford Daily*, 436 U.S. 547, 554-55 (1978).   In the context of a warrant application, "the task of the issuing magistrate judge is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 230 (1983).   A "wholly conclusory statement" is insufficient to establish probable cause.  *Id.* at 239; *see also United States v. Underwood*, 725 F.3d 1076, 1083-84 (9th Cir. 2013).   Rather, the "affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination." *Underwood*, 725 F.3d at 1081.   A reviewing court should defer to an affidavit that "provide[s] the magistrate with a substantial basis for determining the existence of probable cause." *Gates*, 462 U.S. at 239.   Conversely, the magistrate's "action cannot be a mere ratification of the bare conclusions of others." *Id.*

Here, despite the search warrant affidavit's repeated invocations of 18 U.S.C. § 1030 (computer fraud) and its recitation of numerous instances during which Mr. Olgado allegedly downloaded information from AMAT's computers, the affidavit presented no evidence to support its contention that any of those downloads occurred without authorization under *Nosal*, 676 F.3d 854.   In *Nosal*, the Ninth Circuit held that an employee who is authorized to access his company's computers does not violate § 1030 when he or she does so, even if his or her intention is to obtain information to use for a competitor.  *Id.* at 858-59, 863-64.   Yet the affidavit

confirmed that Mr. Olgado was employed at AMAT until January 25, 2013, and all of his alleged

downloads were committed months before that date.  Exhibit A, ¶¶ 8 and 18-30.  This means that

Mr. Olgado's downloads occurred at a time when he was authorized to make them, and the

affidavit makes no contrary suggestion.  Thus, the affidavit presented no cause at all to believe

that the Defendants had committed computer fraud in violation of 18 U.S.C. § 1030.

The allegation of trade secrets theft fares no better.  At the time of the search warrant

application, 18 U.S.C. §1839(3) defined trade secrets as follows:

> [T]he term "trade secret" means all forms and types of financial, business,
> scientific, technical, economic, or engineering information, including patterns,
> plans, compilations, program devices, formulas, designs, prototypes, methods,
> techniques, processes, procedures, programs, or codes, whether tangible or
> intangible, and whether or how stored, compiled, or memorialized physically,
> electronically, graphically, photographically, or in writing if —
>
> (A) the owner thereof has taken reasonable measures to keep such
> information secret; and
>
> (B) the information derives independent economic value, actual or
> potential, from not being generally known to, and not being readily
> ascertainable through proper means by, the public.

(The statute was amended in 2016, but that amendment post-dates the warrant application.  *See*

*United States v. Liew*, 856 F.3d 585, 597 (9th Cir. 2016)).  The Ninth Circuit has held that this

definition has three elements: "(1) that the information is actually secret because it is neither

known to, nor readily ascertainable by, the public; (2) that the owner took reasonable measures

to maintain that secrecy; and (3) that independent economic value derived from that secrecy."

*Chung,* 659 F.3d at 824-825; *see also Liew,* 856 F.3d at 596 (same).

Here, apart from a terse statement explaining that AMAT "considers its BOMs trade

secrets" and asserting that AMAT "would not distribute BOMs to potential customers," (Exhibit

A, ¶ 29), the affidavit presented no *evidence* tending to show that the information allegedly

stolen by the Defendants was in fact secret or that AMAT had taken any measures to keep any of the allegedly stolen information secret.  The affidavit made no reference to confidentiality agreements with its employees (including specifically with Messrs. Chen, Olgado, Hsu and Ewald), non-disclosure agreements with customers or other third parties, encryption or other measures taken to maintain the secrecy of the information that the Defendants had allegedly stolen.  Even more clearly, the affidavit failed to provide a scintilla of evidence to support the proposition that the allegedly stolen information possessed independent financial value arising from the fact that the information was not generally known to the public.  Thus, the affidavit failed to present the magistrate with any facts tending to establish any of the statute's three definitional requirements for a trade secret.  *See Underwood*, 725 F.3d at 1081 ("An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination.").

These deficiencies stand in stark contrast to those cases that have found sufficient evidence to show that alleged trade secrets were in fact secret, that the owner had taken reasonable measures to maintain their secrecy and that the alleged secrets derived financial value from being secret.  For example, in *United States v. Minh Hoang*, No. 2:17-cr-0444-TC, 2019 U.S. Dist. LEXIS 191834 (D. Utah Nov. 4, 2019), faced with a similar challenge to a search warrant affidavit, the court observed that the alleged victim "went to great lengths to keep its material private, including through employment contracts and the monitoring of its employees' computers."  *Id*. at *9.  Because a "reasonable person could conclude that [the alleged victim] would only do this if the material was economically valuable and not widely accessible …[this] conduct provides probable cause that the material included trade secrets."  *Id*.; *see also United*

*States v. Sember*, 170 F. Supp. 3d 1049, 158 (W.D. Oh. 2016) (alleged suspect signed a non-disclosure agreement prohibiting his appropriation or disclosure of specified information without authorization); *Liew*, 856 F.3d at 602 (the evidence at trial established that the alleged victim had protected its secrets by disclosing them only to outside contractors who were (1) carefully selected based on long term working relationships that demonstrated they were "trustworthy," (2) required to sign confidentiality agreements, (3) given information on a "need to know only basis," and (4) not given flow sheets like Trade Secrets 2 and 4 or otherwise allowed to keep materials related to DuPont's TiO2 technology").  Here, by contrast, the affidavit includes no evidence showing that AMAT had taken similar measures to protect its information.

In sum, the search warrant affidavit provided the magistrate no reasonable grounds to believe that Defendants had committed computer fraud or had stolen AMAT's trade secrets. Accordingly, the search warrants were infirm and the resultant searches violated Messrs. Chen's, Olgado's, and Ewald's Fourth Amendment rights.

### B.   Material Omissions of Fact Vitiated the Probable Cause Showing in the Search Warrant Affidavit

Assuming arguendo that this Court were to find that probable cause existed for the challenged searches, suppression would still be required.  In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that a defendant may challenge a facially valid search warrant affidavit by making a substantial preliminary showing that the affidavit contains intentionally or recklessly false statements and that the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause.  *Id.* at 171; *see also United States v. Lefkowitz*, 618 F.2d 1313, 1317 (9th Cir. 1980).  The Court's decision in *Franks* was premised on a seemingly self-evident proposition:

> [B]ecause it is the magistrate who must determine independently whether there is probable cause, . . . it would be an unthinkable imposition upon his authority if a

warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.

438 U.S. at 165.  The Ninth Circuit has explained that the *Franks* admonition against misleading warrant applications applies to material omissions as well as to affirmative misrepresentations:

> The use of deliberately falsified information is not the only way by which police officers can mislead a magistrate when making a probable cause determination.  By reporting less than the whole story, an affiant can manipulate inferences a magistrate will draw.  To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning.

*United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985).  The omission of facts rises to the level of misrepresentation if the omitted facts "cast doubt on the existence of probable cause." *United States v. Johns*, 948 F.2d 599, 606-07 (9th Cir. 1991).  At this preliminary stage of the proceedings, clear proof of deliberateness or recklessness is not required; instead "all that is required is that the defendant make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Stanert*, 762 F.2d at 781.

Here, Defendants have made the required showing.  First, the affidavit concealed the fact that a state court judge had already rejected AMAT's trade secret claims after a contested evidentiary hearing on an application for a TRO.  Clearly, the state court decision was material to the magistrate's determination of probable cause, and there could be no legitimate reason to withhold that information from him.  Moreover, the impact of that omission was exacerbated by the affidavit's affirmative presentation of statements concerning the stipulated TRO that required Mr. Olgado to return property to AMAT, thereby creating the false impression that Mr. Olgado had not resisted AMAT's trade secret theft claims and perhaps had admitted them.  To the contrary, Messrs. Chen, Olgado, Hsu and Ewald had formally denied those claims, were contesting them in court, and had successfully opposed the TRO application by obtaining a court

finding that AMAT had "failed to show a reasonable probability that it is likely to prevail on the merits." Exhibit L, excerpt of transcript, TR 163:15; TR 167:5. Because the affidavit was misleading as to each of those facts, the reviewing magistrate's independent and objective role under the Fourth Amendment was neutralized.

The Ninth Circuit's decision in *Stanert* demonstrates why the omission is material. There, a Sheriff's Deputy applied for a search warrant for a residence that was the suspected location of clandestine drug laboratory. Among the allegations supporting probable cause was a truthful statement that a few years earlier the current resident "had been arrested in Panama with approximately 14 pounds of cocaine." 762 F.2d at 777. However, the affiant failed to disclose that the resident had not been convicted of any offense arising from that arrest—even though the affiant was in possession of DEA records reflecting that there had not been a conviction. *Id*. at 780. The court of appeal found this omission to be material under *Franks*:

> [T]he mere fact that the affidavit spoke only in terms of an arrest does not mean that failure to inform the judge of the apparent disposition of the charge was not misleading. Inclusion of the information serves to weaken the significance of Stanert's arrest for possession of 14 pounds of cocaine because the apparent absence of a conviction would raise doubts as to whether Stanert had any connection with the cocaine which was seized.

*Id*. at 781. Relying on this and three other alleged omissions, the court of appeal concluded that the defendant had made a sufficient showing under *Franks* to vitiate the affidavit's showing of probable cause. *Id*. at 782.

The *Stanert* rationale applies here: the facts omitted from the search warrant affidavit "cast doubt on the existence of probable cause." *Johns*, 948 F.2 at 606-07. Moreover, as in *Stanert*, the affidavit's omission regarding the state court judge's denial of the TRO is but one of several misleading omissions of material fact. As set forth above, the affidavit also suffered from other material omissions and misrepresentations:

- It omitted the fact that Mr. Chen and Mr. Hsu had filed sworn declarations in the state court case with detailed rebuttals of AMAT's trade secret theft claims.  Exhibits J and K.  The factual allegations set forth in these declarations were directly relevant to the magistrate's inquiry and supported Defendants' innocence of the allegations.

- It misled the magistrate as to the significance of a PowerPoint presentation that Mr. Hsu sent to the other Defendants.  Exhibit A, ¶ 20.  The affidavit observed that the PowerPoint, an email attachment denominated "WY-Competitive Analysis 092412," contained two pages marked "Applied Materials Confidential."  Exhibit A, ¶ 20.  However, Mr. Chen stated in his declaration that the attachment, "WY-Competitive Analysis 092412," consisted of publicly available information that had in fact been presented to the DOE in June 2012.  Chen Declaration, ¶¶ 15-16.  *See* Exhibit N, the presentation to the DOE that was Exhibit Six to the Chen Declaration.  Chen's sworn statements and the attached copy of the DOE PowerPoint rebutted the affidavit's assertion that Mr. Hsu emailed AMAT confidential material to his colleagues.  But they were withheld from the magistrate.

- It omitted reference to an August 24, 2012 email from Gary Dickerson, AMAT's President, to Mr. Chen stating that although he did not think AMAT desired to be proactive "on a potential spinout," he "personally would be happy to help you with this project if you can find some group that can make a more compelling proposal."  Exhibit O.  This email contradicted the affidavit's assertion that as of July 20, 2012, Mr. Chen "had no authorization going forward to represent any connection to Applied Materials for any future venture…."  *See* Exhibit A, at ¶ 11.  The email also affirmatively demonstrated that Mr. Chen was not attempting to conceal his efforts to create a new company to

utilize AMAT's MOCVD technology.

- It omitted reference to the December 11, 2012, email exchange between Mr. Chen and his former AMAT supervisor, AMAT's Executive Vice President, in which Mr. Chen invited the then Executive Vice President to sit on the Board of Directors of his new company and the Executive Vice President expressed interest. Exhibit P, December 17, 2012 email. Clearly, Mr. Chen could not hope to build a new company based on trade secrets stolen from AMAT if his former Executive Vice President served on the company's Board.

Taken together, the affidavit's misleading omissions violated Defendants' Fourth Amendment right to have a neutral and detached magistrate determine whether probable cause existed for the issuance of the search warrants. *Franks,* 438 U.S. at 165.

### C.     The Search Warrants Lacked Sufficient Particularity and were Overbroad

The Fourth Amendment's particularity requirement serves two separate and distinct but related purposes. First, the mandate that warrants specifically identify the items to be seized prevents "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971). It "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is [to] be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford v. Texas,* 379 U.S. 476, 485 (1965); *see also United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) ("[T]he warrant must make clear to the executing officer exactly what it is that he or she is authorized to search for and seize."). Second, the particularity requirement ensures that a search is not overbroad—i.e., that the scope of the search is delimited by the evidence relating to a specific crime for which there is demonstrated probable cause. *SDI Future Health,* 568 F.3d at

702. In other words, "a warrant must not only give clear instructions to a search team, it must also give legal, that is, not overbroad, instructions.  Under the Fourth Amendment, this means that there [must] be probable cause to seize the particular thing[s] named in the warrant."  *Id.* at 702-03 (quoting *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991), quotation marks omitted).  Factors to which the courts look to see if these two requirements are met include: (1) whether there was probable cause to seize particular items in the warrant; (2) whether the warrant sets out objective standards by which executing officers can determine which items are subject to seizure, and (3) whether the government could have described the items with more particularity when the warrant was issued.  *United States v. Wong*, 334 F.3d 831, 836-37 (9th Cir. 2003) (citing *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)).  Courts have held that a failure to impose date restrictions reasonably corresponding to the scope of probable cause established by the affidavit on emails to be searched and/or seized is one manner in which a search warrant for email accounts may suffer from overbreadth.  *See United States v. Blake*, 868 F.3d 960, 973 n.7 (11th Cir. 2017); *United States v. Hanna,* 661 F.3d 271, 287 (6th Cir. 2011);  *In re Google Email Accounts Identified in Attachment A,* 92 F. Supp. 944, 952-53 (D. Ak. 2015).

Here, the warrants failed both aspects of the particularity requirement.  First, they provided no meaningful guidance to the executing agents about what items could be seized.  The deficiencies are clearest as to the warrants for Messrs. Chen's, Olgado's and Ewald's Gmail accounts because Attachment A-2, describing the items to be seized, did not even restrict the warrants' scope to evidence of a crime or crimes.  Exhibit B, Attachment A-2.  Rather the warrants authorized the seizure of any emails or attachments from within the preceding 12 months that *referred to or pertained in any way to* AMAT, to the Defendants' former supervisors

at AMAT, to several other employees at AMAT, and/or included such innocuous terms as "assembly," "patent," "package," "part numbers," "paper trail" and "conflict of interest." Exhibit C, Attachment A-2. Even with the protocol accompanying the warrant, the warrants for the three Gmail accounts provided the executing agents with insufficient guidance.

Second, the scope of the searches and seizures authorized by the warrants extended far beyond any probable cause arguably established by the underlying affidavit. The affidavit purported to establish probable cause for computer fraud and trade secrets theft, yet the warrants authorized the seizure of all of the items listed in the previous paragraph plus any communications "between or among" the Defendants and three other individuals. Exhibits B and C, Attachments A-2 and Attachment B. Clearly, the warrant authorized a fishing expedition that exceeded the bounds of probable cause. The warrants' temporal limits were also untethered to probable cause. For example, the warrants authorized the seizure of emails and attachments dating back to March 1, 2012, even though the affidavit itself stated that AMAT had authorized Mr. Chen to pursue joint ventures and/or spinoffs until at least July 20, 2012. Exhibit A, ¶ 11. Finally, the warrants authorized the seizure of any document that "refers or pertains in any way" to a whole range of varied topics, including without limitation, "AMAT," the company where each of the Defendants had been employed for years.

For these reasons, the search warrants' overbreadth and lack of particularity violated Messrs. Chen's, Olgado's and Ewald's Fourth Amendment rights.

### D.    The Execution of the Search Warrants Exhibited a Reckless Pattern of Disregard for the Applicable Rules and Protocols

The agents who seized the electronic devices from Mr. Olgado's residence violated at least two of the search warrant protocol's requirements: (1) to determine on-site "whether all or part of a search of a device or media that stores data electronically ('the device') reasonably can

be completed at the location listed in the warrant ('the site') within a reasonable time" and (2) to use reasonable efforts to return, delete or destroy any electronic devices within 60 days after they were imaged, Exhibit C, Attachment C, ¶¶ 1-3.  Further, the government applied for an extension of that sixty-day period more than two months after it expired and did not even attempt to offer a basis for a finding of excusable neglect.  See Exhibit F.  Together with the fundamental deficiencies of the warrant and warrant application, these violations established a pattern of "reckless disregard of procedure" that requires the suppression remedy.  *United States v. Mutschelknaus,* 592 F.3d 826, 829 (8th Cir. 2010), quoting *United States v. Spencer*, 439 F.3d 905, 913 (8th Cir. 2006).

## IV.   CONCLUSION

For all of the reasons set forth above, the search warrants for Mr. Olgado's residence and for the Gmail accounts of Messrs. Chen, Olgado and Ewald were constitutionally deficient and the searches executed under those warrants' authority were unreasonable and violated Defendants' Fourth Amendment rights.  Accordingly, all of the evidence seized under those warrants must be suppressed.

Dated:  August 28, 2020        Respectfully submitted,

                                     ARGUEDAS, CASSMAN, HEADLEY & GOLDMAN LLP


                                     By:     /s/ Ted W. Cassman
                                        Ted W. Cassman
                                        Attorneys for Defendant
                                        Liang Chen